UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-60763-CIV-COHN/SELTZER

MICHAEL KRAPF,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.
_____/

## REPORT AND RECOMMENDATION TO DISTRICT JUDGE

### I.    INTRODUCTION

THIS CAUSE is before the Court on the cross-motions for summary judgment[1] filed,

respectively, by Plaintiff Michael Krapf ("Claimant") and by Defendant Michael J. Astrue,

Commissioner of Social Security ("Commissioner").  The motions were referred to the

undersigned pursuant to 28 U.S.C. § 636 and Magistrate Rule 1(c) and (d), Local Rules

of the United States District Court for the Southern District of Florida.

The cross-motions present the following issue:  whether there exists substantial

evidence to support the determination of the Administrative Law Judge ("ALJ") that

Claimant has the residual functional capacity ("RFC") to perform the full range of simple,

unskilled medium work and, therefore, is "not disabled" within the meaning of the Social

Security Act.  Because the ALJ's rejection of the treating source opinion, as well as his

_____

[1] Although other circuits have found the summary judgment device inappropriate
for deciding cases under the Social Security Act, see, e.g., Igonia v. Califano, 568 F.2d
1383 (D.C. Cir. 1977), this Circuit has deemed it appropriate where the district court has
reviewed the record and based its judgment on a finding of substantial evidence in the
administrative record. See Lovett v. Schweiker, 667 F.2d 1 (5th Cir. 1981).

assessment of other medical source opinions, was flawed, the undersigned concludes that substantial evidence does not support the ALJ's RFC determination. Accordingly, the undersigned RECOMMENDS that Plaintiff's Motion for Summary Judgment (DE 12) be GRANTED, that Defendant's Motion for Summary Judgment (DE 13) be DENIED, and that the Commissioner's decision be REVERSED and REMANDED for further proceedings.

## II.   PROCEDURAL HISTORY

On November 8, 2006, Claimant filed applications for a period of Disability, for Disability Insurance Benefits ("DIB"), and for Supplemental Security Income ("SSI"), alleging that he became disabled as of June 30, 2004. Tr. 89-96. The Social Security Administration denied Claimant's applications initially and upon reconsideration. Tr. 67-69, 71-73, 79-80, 82-84.

Claimant filed a timely request for hearing; a hearing was held before an ALJ on May 19, 2008. Tr. 20-47. Accompanied by counsel, Claimant and his mother appeared at the hearing and testified. Tr. 20-47. On August 21, 2008, the ALJ issued his decision, finding that Claimant is "not disabled" because he retains the residual functional capacity to perform the full range of medium work entailing no more than simple instructions and that given his age, education, and vocational background, the Guidelines direct a finding of "not disabled." Tr. 12-19. On April 10, 2009, the Appeals Council denied Claimant's request for review, leaving the ALJ's decision standing as the final decision of the Commissioner. Tr. 1-4.

On May 22, 2009, Claimant filed a Complaint in this Court seeking judicial review of the Commissioner's decision (DE 1). On August 31, 2009, the Commissioner filed an Answer, together with the administrative record (DE 7, 8). On October 27, 2009, Claimant

2

filed Plaintiff's Motion for Summary Judgment and Memorandum of Law in Support Thereof

(DE 12), and on November 13, 2009, the Commissioner filed Defendant's Combined

Motion for Summary Judgment with Supporting Memorandum of Law and Opposition

Response to Plaintiff's Motion for Summary Judgement (DE 13).  Thereafter, undersigned

directed the Commissioner to file a supplemental response, which he did on November 17,

2009 (DE 17).

The matter is now ripe for review.

III.    FACTS

The undersigned has reviewed the Statement of Facts contained within the

Plaintiff's Motion and finds that it fairly and accurately summarizes the relevant portions of

the administrative record.[2]

## A.    Mr. Krapf's Testimony

Mr. Krapf was born on September 17, 1979 and was 24 years
old as of June 30, 2004, the alleged onset of his disability (Tr.
27).  As of December 31, 2006, the date he last met the
insured requirements under the Social Security Act, Mr. Krapf
was 27 years old, the oldest age at which he may be
considered in connection with his Title II claim (Tr. 97).  He
graduated high school with a special education diploma and
thereafter did not receive any further formal education or
vocational training (Tr. 27).  Since having graduated from high
school, his only work has been laying tile and laying cable (Tr.
[27-]28).  He stopped working in June of 2004 because he
"ke[pt] messing up".  He wasn't working "fast enough" and got
in a couple of fights with one of the other workers because he
was always "picking on" him (Tr. 28-29).  He is adept at
"putting stuff together" at home, but in the workplace he has
difficulty getting along with others (Tr. 29).  He also suffers
from panic attacks at night while sleeping, usually about twice
a night (Tr. 30).  He would get "bored" or "fall asleep" in a

---

[2] The undersigned has bracketed any corrections to Plaintiff's Statement of Facts.

sedentary type job such as telemarketing (Tr. 30). The medications he takes cause sleepiness, and although they are supposed to help with his tendency to "get bored very easy," sometimes they are not effective (Tr. 30).

Mr. Krapf lives with his mother and step father (Tr. 27). He can fix bicycles but has only worked on his own bike, not on anyone else's (Tr. 33-34). He sometimes helps his father with his yard work (Tr. 35). He would be able to help a neighbor with his yard work if asked, but only sometimes, not all the time (Tr. 36). He does not own a cell phone because he doesn't believe in them (Tr. 36). His parents own a computer but he won't use it because he has already "crashed" a computer twice and therefore avoids them (Tr. 36).

## B.    Testimony of Ms. Bolling

Ms. Bolling, Mr. Krapf's mother, testified on his behalf at the hearing (Tr. 38-46). She agreed that he is good at fixing bikes and that, at the house, he maintains their yard and works on his bike and the lawn equipment (Tr. 39). She doesn't know if he could perform work such as fixing bikes every day, because he has problems with his wrist (Tr. 40). She didn't know whether his difficulties dealing with people would affect his ability to function in a work setting (Tr. 40). She did state that he has a hard time following directions, his memory is "extremely bad," and that he has "impulsive anger" (Tr. 40). His impulsiveness occurs "constantly": When she is in the house she can hear him outside "yelling and screaming and throwing things" (Tr. 40). He cannot read, not even manuals (Tr. 40). The longest job he's held was for 18 months at State Line Fireproofing, but "it was a constant battle" for him there [(Tr. 40-41)]. She explained his medical problems to his boss; nonetheless, he would lose his patience, have angry outbursts, and walk off the job (Tr. 41). They eventually called her to tell her not to bring him back (Tr. 41). He once held a landscaping job for a week and they called her and told her that they did not want him to return [(Tr. 41)]. Again, he was angry and very forgetful, failing to remember the things he was sent to get (Tr. 41). When he'd go back to ask for a reminder as to what he was supposed to get, his employer would get annoyed because of the waste of time involved (Tr. 41). Ms. Bolling has to set out his medication for him every day and remind him to take it [(Tr. 41)]. Sometimes she'll direct him to take it and find it still lying there (Tr. 41-42). If she is not there to keep

4

reminding him about his medications, he does not take them at all (Tr. 42). He doesn't object to taking them, he just doesn't remember to take them (Tr. 42). Getting him to take a shower and wear appropriate clothes is also "like a fight" (Tr. 42). All of this behavior started when Mr. Krapf was about five years old, and things are getting more difficult as he's getting older (Tr. 43). He doesn't even brush his teeth or comb his hair without his mother getting "on him all the time" (Tr. 43). He does not have a bank account and has not worked at all since 2004 (Tr. 43). She doesn't let him use the stove or oven because he forgets to turn it off (Tr. 43). She believed that he would be better in a job performed by himself, but she had doubts about his ability to complete tasks because of his difficulty concentrating and tendency to get sidetracked (Tr. 44). He gets "angry when someone tries to tell him to do something" (Tr. 44). In a normal day, he goes in and out of the house constantly, sometimes just to stand out front or to talk to the neighbor across the street, but he doesn't remain in one place for long: "in and out, in and out, in and out" (Tr. 45). He cannot drive anymore because of his "impulsive behavior" (Tr. 45).

## C.    Relevant Medical Evidence of Record

### 1.    Dr. Schapiro – Treating Psychiatrist, Childhood Through Present

Mr. Krapf has been treated by psychiatrist Salo Schapiro since 1985 due to "behavioral difficulties and hyperactivity, resulting in significant problems in school" such that he was expelled from kindergarten due to his behavior (Tr. [203, 241]).    In August of 1985, Michael was admitted to the neuropsychiatric unit at Miami Children's Hospital for fuller assessment (Tr. 221-22).    Scores on standardized neuropsychiatric testing were believed to be compromised due to inattention and hyperactivity during testing, but the administering doctor, Dr. Ruth Latterner, opined that the scores still approximated a valid estimate of his cognitive function at the time (Tr. 207-08). She found that Michael was functioning within the intellectually average range but with a significant disparity between verbal and performance IQ, suggesting left hemisphere dysfunction and auditory verbal perceptual deficits (Tr. 209). He was said to exhibit characteristics of Attention Deficit Disorder ("ADD") with hyperactivity and a "severe learning disability," for which

5

she recommended a stringent behavioral modification program, psychotherapy, medication, and a special educational environment which would accommodate his needs (Tr. 209-10). On September 23, 1985, after examination by a speech-language pathologist, Michael was diagnosed with a receptive/expressive speech and language disorder as well as a marked auditory processing deficit (Tr. 233-236). An occupational therapist recommended a program for intensive behavior modification and psychotherapy (Tr. 241). Michael was placed on Mellaril and Tofranil "with positive results" (Tr. 325). He was then referred for continued inpatient treatment, and ultimately spent an entire year – from August of 1985 through August of 1986 – at Grant Center Hospital, after which he was sent to another special learning center (Id.).

In March of 1988, when Michael was eight years old, he was referred by Dr. Schapiro for psychological re-evaluation by clinical psychologist Carol Nudelman (Tr. 325-329). On the basis of tests that she either reviewed or administered, it was determined that Michael had improved in the verbal portions of IQ testing and was functioning in the low average range overall, but that his visual spatial analysis was "particularly weak," revealing problems with visual-motor integration ability (Tr. 328). Personality testing continued to show misperceptions and confusion when confronted with novel, ambiguous, or emotionally arousing situations (Tr. 328). He lacked appropriate social skills and was "extremely immature" for his age (Tr. 328). He was found to continue to require special education placement (Tr. 328).

As an adult, Mr. Krapf continues to see Dr. Schapiro for ongoing psychiatric care approximately every two months (Tr. 369-80). Treatment notes from May of 2006 are scarcely legible, but he does ultimately diagnose ADHD and Depression and assessed his GAF at 45[3] (Tr. 374). Subsequent brief notes from visits between May of 2006 and March of 2008 document

---

[3] The Global Assessment of Functioning or "GAF" scale reflects a clinician's assessment of the individual's overall level of functioning. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 30 (4th ed.1994) ("*DSM-IV*"). A GAF between 41 and 50 "is characterized by serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). *DSM-IV* at 32.

changes in his prescribed medication regimen (Tr. 369-373).

In a Treating Source Mental Health Report propounded by the Administration and dated June 27, 2007, Dr. Schapiro acknowledged that Mr. Krapf's present mood and affect are reactive, he has a severe learning disability, his thought process[es] are disorganized and circumstantial, his concentration and memory for both recent and remote events are poor, and his behavior still hyperactive (Tr. 381-82). He affirmed the diagnoses of ADHD, a severe Learning Disorder, and a Mood Disorder not otherwise specified (Tr. 382). He opined that he would be capable of working no more than "part time" (Id.).

In a letter dated April 1, 2008, Dr. Schapiro affirmed his treatment of Mr. Krapf over the preceding 20 years, noting that in addition to his behavioral problems, he has a "severe learning disability primarily in the areas of reading and writing" such th[at] he "operates at a third grade level in both areas" (Tr. 401). Although he [received] vocational training at a state-funded school for the severely learning disabled, he ultimately has had difficulty holding any job – from landscaping to carpentry – due to "his impulsivity and his inability to follow directions" (Tr. 401). He continues to see him and to manage his medications – which presently consisted of Elavil, Lexapro, and Concerta – every six to eight weeks (Tr. 401-02). He found him "unable to hold a job on a full time basis" (Tr. 402).

In a Psychiatric/Psychological Impairment Questionnaire dated March 29, 2008, Dr. Schapiro again affirmed the diagnoses of Impulse Control Disorder; ADHD, severe; and a severe Learning Disorder (Tr. 403). He assessed his GAF at 40 presently, no higher than 38[4] in the preceding year (Tr. 403). Clinical findings in support of those diagnoses include poor memory, mood disturbances, emotional lability, psychomotor agitation or retardation, difficulty thinking or concentrating, and social withdrawal or isolation (Tr. 404). As a result of these disorders, Dr. Schapiro found Mr. Krapf "markedly limited" in

---

[4] A GAF between 31 and 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *DSM-IV* at 34.

every given area relating to understanding and memory and sustained concentration and persistence, as well as several areas relating to social interaction and adaptability (Tr. 406-08).

## 2. Dr. Nazario - SSA Consultative Psychologist

On December 28, 2006, Ms. Krapf was examined by Dr. Andres Nazario, a psychologist, at the behest of the Administration (Tr. 330-334). He reported being unable to work due to depression, ADHD, anxiety attacks, learning disability, impulsive behavior, aggressive behavior, extreme hyperactivity, and pain in his wrists, knees, and back for the preceding four years (Tr. 330). He last worked a couple of years prior, moving furniture, but he was let go because he has a "hard time controlling [his] anger" (Tr. [], 332). He was an inpatient from age five to eleven and continues to take medications to control his temper (Tr. 331). He takes Carbamazepine, Amitriptyline, Lexapro, and Concerta (Tr. 331). He has difficulty reading and writing and depends on his mother to write for him (Tr. 331). He arrived late for the interview (Tr. 332). Mental status exam revealed an anxious mood; the ability to perform one subtraction of seven from 100 only after two attempts while counting on his fingers; recall of only one of three objects after a five-minute delay; and recall of three out of four digits in reverse (Tr. 332). Dr. Nazario diagnosed Panic Disorder without agoraphobia; Depressive Disorder not otherwise specified; Impulse Control Disorder not otherwise specified; and rule out Personality Disorder (Tr. 332). He added that he appears "very dependent on his mother" but that he also appears able to understand and follow simple directions and to interact appropriately with others (Tr. 332-33).

## 3. Dr. Shakes-Malone - SSA Consultative Psychologist

On January 23, 2007, the Administration sent Mr. Krapf for Limited Psychological Evaluation with Dr. Latoya Shakes-Malone in connection with his disability claim (Tr. 335-338). Mental status revealed a slightly anxious mood (Tr. 336). The Wechsler Adult Intelligence Scale - Third Edition was administered, on which he attained a verbal IQ score of 74, a performance IQ of 86, and a full scale score of 78, with an overall performance classified in the Borderline range (Tr. 336). He evidenced inter- or intra-test "scatter," with verbal

skills in the borderline range, which suggests that he will "have some difficulty performing and learning cognitive/intellectual tasks at a level equal to that of same-aged peers" (Tr. 337). His prognosis was assessed as "fair" only with compliance with mental health treatment, adding that "social skills training [ ] might allow him to function in a work environment with others" (Tr. 337). Dr. Shakes-Malone diagnosed Impulse Control Disorder, Borderline Intellectual Functioning, and rule out Personality Disorder (Tr. 337).

### 4. Drs. McCallister, Levasseur - State Agency Non-Examining Review Psychologists

On February 19, 2007, Dr. Robin McCallister, a review psychologist with the State agency, assessed Mr. Krapf's residual mental function on the basis of her review of the medical record (Tr. 339-[43]). She assessed moderate limitations in Mr. Krapf's ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without rest periods of unreasonable length and frequency; to maintain socially appropriate behavior; and to adhere to basic standards of neatness and cleanliness (Tr. 339-40).

On July 20, 2007, Dr. James Levasseur also assessed Mr. Krapf's residual mental function (Tr. 383-86). He endorsed moderate limitations in all of the areas of mental function endorsed by Dr. McCallister, in addition to moderate limitations in his ability to accept instructions and respond appropriately to criticism from supervisors (Tr. 383-84).

### 5. Dr. Almahameed - SSA Consultative Internist

On March [13], 2007, the Administration sent Mr. Krapf for internal medicine evaluation by Dr. Soufian Almahameed (Tr. 357-60). In addition to his mental disorders, Mr. Krapf reported pain in his lower back and left knee with prolonged standing or walking as well as a left wrist injury (Tr. 357-58). Physical and neurological examinations showed that he was overweight at a height of five feet six inches and a weight of 200 pounds and an inability to read more than simple words such as prepositions but was otherwise within normal limits (Tr. 358-

> 59). Dr. Almahameed diagnosed a Learning Disability due to a reading disorder and math disorder; Aggressive-compulsive behavior; history of left wrist trauma; back pain; and knee pain (Tr. 360).

Plaintiff's Motion at 1-8 (DE 12).

## IV.    STANDARD OF REVIEW[5]

In reviewing claims brought under the Social Security Act, the court's role is a limited one.  The Commissioner's findings of fact must be affirmed if they are based upon "substantial evidence." Richardson v. Perales, 402 U.S. 389, 401 (1971); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  "Substantial evidence" is evidence that a reasonable person would accept as adequate to support the challenged conclusion. Perales, 402 U.S. at 401; Walden v. Schweiker, 672 F.2d 835, 839 (11th Cir. 1982).  The court may not "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." Bloodsworth, 703 F.2d at 1239.  In addition to determining whether the Commissioner's factual findings are supported by substantial evidence, the court must determine whether the ALJ properly applied the correct legal standards. Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982).

## V.    ANALYSIS

### A.    The Sequential Evaluation

A "disability" is defined as an inability

---

[5] The SSI disability regulations appear in Subsection I of 20 C.F.R. Part 416, 20 C.F.R. § 416.901 et seq., and are generally identical to those set forth in 20 C.F.R. Part 404, Subsection P, 20 C.F.R. § 404.1501 et seq., governing Social Security disability determinations.  The standard of review in SSI cases is the same as the standard for Social Security disability cases.  42 U.S.C. § 1383(c)(3).  Consequently, the case law addressing Social Security disability determinations is generally applicable to SSI cases.

> to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can
> be expected to last for a continuous period of not less than 12
> months.

42 U.S.C. § 1382c(a)(3)(A).  In determining the merits of a claim for benefits, courts must

consider the evidence as a whole, including:  1) objective medical facts or clinical findings;

2) diagnoses of examining physicians;  3) subjective evidence of pain and disability as

testified to by the claimant and corroborated by other witnesses; and 4) the claimant's age,

education, and work history.  Walden, 672 F.2d at 839.

To arrive at a determination as to disability, the ALJ must undertake the sequential

evaluation embodied in 20 C.F.R. §§ 404.1520 and 416.920.  This process requires that

the ALJ first determine whether the claimant is presently engaged in substantial gainful

employment.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If so, a finding of "no disability" is

made.

If the claimant is not engaged in such work, then the ALJ must proceed to the

second step and determine whether the claimant suffers from a "severe impairment."  An

impairment is severe if it significantly limits the claimant's physical or mental ability to

perform basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If a severe

impairment is not found, then the ALJ will conclude that there is no disability; if a severe

impairment is found, then the ALJ will proceed to the next phase of the analysis.  Id.

The third step requires the ALJ to determine whether the claimant's impairment

meets or equals those listed in Appendix I of the Regulations.  20 C.F.R. §§ 404.1520(d),

416.920(d).  If so, the ALJ will find the claimant disabled without considering age,

education, and work experience.  If not, the inquiry will proceed to the next stage.

Step four requires the ALJ to determine whether the claimant has the "residual functional capacity" to perform past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). The Regulations define "residual functional capacity" as "what you can still do despite your limitations." 20 C.F.R. §§ 404.1545, 416.945. This determination takes into account "all relevant evidence," including the medical evidence, the claimant's own testimony, and the observations of others. Id. The ALJ must then compare the residual functional capacity to the demands of the previous employment to determine whether the claimant is still capable of performing that kind of work. If so, the claimant is found not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f).

If the claimant establishes an inability to return to past relevant work, the burden shifts to the Commissioner to demonstrate that there exists other substantial gainful employment in the national economy that the claimant can perform. Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); Smith v. Schweiker, 646 F.2d 1075, 1077 (5th Cir. Unit A 1981). If the Commissioner points to possible alternative employment, then the burden returns to the claimant to prove an inability to perform those jobs. Smith, 646 F.2d at 1077. These shifting burdens comprise the fifth and final step, at which point the ALJ must resolve whether the claimant is actually capable of performing other gainful and substantial work within the economy. 20 C.F.R. §§ 404.1520(g), 416.920(g).

To help evaluate whether there exist sufficient jobs that can be performed given the claimant's age, education, and physical limitations, the Commissioner has promulgated Medical Vocational Guidelines. See 20 C.F.R. § 404, Subpt. P, App. 2. The Guidelines may be applied where a claimant is not performing substantial gainful activity and is prevented by a severe, medically determinable impairment from doing past relevant work.

20 C.F.R. §§ 404.1569, 416.969. The Guidelines are composed of detailed grids and rules, which, based on a claimant's residual functional capacity, age, education, and previous work experience, direct a finding of disabled or not disabled. See Walker, 826 F.2d at 1002.

Yet, the Guidelines "do not cover all possible variations of factors" and are inapplicable "if one of the findings of fact about the person's vocational factors and residual functional capacity is not the same as the corresponding criterion of the rule." 20 C.F.R. §§ 404.1569, 416.969. The Guidelines, therefore, are generally not applicable where the claimant is unable to "perform the full range of work required of that category on a daily basis." Hargis v. Sullivan, 945 F.2d 1482, 1490 (10th Cir. 1991). Further, they may not be used when the claimant suffers from (significant) non-exertional limitations, such as (significant) mental impairments. Id.; Walker, 826 F.2d at 1003. When the Guidelines may not be conclusively applied, they may serve only as a framework to determine whether sufficient jobs exist within the claimant's range of residual functional capacity. Hargis, 945 F.2d at 1490. In such instances, the Commissioner must instead carry his burden through the use of a vocational expert. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989); Walker, 826 F.2d at 1003. A vocational expert provides the ALJ with a realistic appraisal of the work a claimant is capable of performing. Bowen, 889 F.2d at 50.

B.    Application of the Sequential Evaluation by the ALJ

After considering all of the evidence, the ALJ concluded that Claimant retains the RFC to perform the full range of simple, unskilled medium work and that pursuant to Guidelines he is "not disabled" within the meaning of the Social Security Act. Tr. 19.

In arriving at this conclusion, the ALJ addressed each step in the evaluative

13

sequence.[6] He first observed that Claimant has not engaged in substantial gainful activity since June 30, 2004, the date of his alleged onset of disability. Tr. 14. The ALJ next found that Claimant suffers from the following "severe" impairments: "panic disorder, depressive disorder, impulse control disorder, attention deficit disorder, and learning disorder." Tr. 14. Additionally, the ALJ found that Claimant does not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. Tr. 14.

The ALJ then assessed Claimant's RFC. As part of this assessment, the ALJ considered all the evidence, including Claimant's subjective complaints; however, the ALJ found that Claimant's subjective complaints "are not credible." Tr. 16. Then, after considering the entire record, including medical evidence, the ALJ found that Claimant has the RFC "to perform the full range of medium work . . . . He can understand, remember and carry out simple instructions; accept instructions and respond appropriately to criticism from supervisors and get along with coworkers; and respond appropriately to changes in the work setting." Tr. 15-16.[7]

---

[6] Preliminarily, with respect to Claimant's DIB application, the ALJ noted that Claimant "has acquired sufficient quarters of coverage to remain insured through December 31, 2006." Tr. 12, 14. Accordingly, Claimant must establish disability between June 30, 2004 (onset date) and December 31, 2006 (date last insured) to be entitled to disability insurance benefits.

With respect to Claimant's SSI application, Claimant need only establish disability while his application is pending. See 42 U.S.C. § 1382c; 20 C.F.R. §§ 416.330 and 416.335.

[7] Social Security Ruling 83-10 defines "medium work":

> Medium Work. The regulations define medium work as lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. A full range of

14

After determining Claimant's RFC, the ALJ observed that Claimant has no past

relevant work. Tr. 18.

Finally, the ALJ sought to determine whether there exist jobs in significant numbers

in the national economy that Claimant can perform. He considered that Claimant is a

younger individual with a high school education, and he noted transferability of job skills

is not an issue (because of Claimant's lack of past work). Tr. 18. Applying these facts,

> medium work requires standing or walking, off and on, for a
> total of approximately 6 hours in an 8-hour workday in order to
> meet the requirements of frequent lifting or carrying objects
> weighing up to 25 pounds. As in light work, sitting may occur
> intermittently during the remaining time. Use of the arms and
> hands is necessary to grasp, hold, and turn objects, as
> opposed to the finer activities in much sedentary work, which
> requires precision use of the fingers as well as use of the
> hands and arms.
>
> The considerable lifting required for the full range of medium
> work usually requires frequent bending-stooping. (Stooping is
> a type of bending in which a person bends his or her body
> downward and forward by bending the spine at the waist.)
> Flexibility of the knees as well as the torso is important for this
> activity. (Crouching is bending both the legs and spine in order
> to bend the body downward and forward.) However, there are
> relatively few occupations in the national economy which
> require exertion in terms of weights that must be lifted at times
> (or involve equivalent exertion in pushing or pulling), but are
> performed primarily in a sitting position, e.g. taxi driver, bus
> driver, and tank-truck driver (semiskilled jobs). In most
> medium jobs, being on one's feet for most of the workday is
> critical. Being able to do frequent lifting and carrying of objects
> weighing up to 25 pounds is often more critical than being able
> to lift up to 50 pounds at a time.

1983 WL 31251, at *6 (S.S.A.).

the ALJ determined that Medical-Vocational Rule 203.28 directed a finding of "not disabled." Tr. 19. The ALJ then concluded that Claimant "has not been under a disability, as defined in the Social Security Act, from June 30, 2004, through the date of this decision" and that he, therefore, is not entitled to either DIB or SSI benefits. Tr. 19.

## C. Discussion

Claimant disputes the findings and conclusions of the ALJ. Claimant argues that the ALJ's RFC finding – more specifically, that a limitation to simple tasks is the only functional restriction caused by Claimant's mental disorder – is based on an erroneous rejection of the treating psychiatrist's opinion, an unjustified failure to credit one of the examining psychologist's opinion, and a misrepresentation of the non-examining psychologists' opinions. See Plaintiff's Motion at 9 (DE 12). Claimant further argues that the RFC finding lacks the support of substantial evidence. See id. at 14.

For the reasons set forth more fully below, the undersigned concludes that the ALJ's RFC finding that Claimant could perform the full range of exertionally medium work, limited to no more than simple tasks, is predicated on an improper rejection of the longtime treating psychiatrist's opinion. Although the ALJ's improper rejection of the treating source's opinion would alone warrant a remand, the undersigned further finds that the ALJ improperly ignored the opinion of a consultative psychologist and did not account for the full opinions of the non-examining state agency psychologists, whose opinions he purportedly accorded "great weight."

### 1. The Treating Source's Opinion

#### a. ALJ's Articulated Reasons for Discounting Treating Source

The Regulations require that an ALJ give more weight to the opinion of a treating

16

source. See 20 C.F.R. § 404.1527(d)(2). Indeed, the ALJ must accord a treating source opinion controlling weight where it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. See id. When controlling weight is not accorded the opinion, the ALJ must consider the specialization of the physician, the length of the treatment relationship, the nature and frequency of the examinations, the evidence offered in support of the opinion, and the consistency of that opinion with the record as a whole. See 20 C.F.R. § 404. 1527(d). Similarly, the Eleventh Circuit has made clear that the opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir.2004) (citation omitted). "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons." Id. It is against this requirement of articulating "good cause" that the undersigned must assess the ALJ's proffered reasons for discounting the opinion of the treating source.

The ALJ acknowledged that the treating source, Salo Schapiro, M.D., is a psychiatrist who has been caring for Claimant for more than twenty (20) years; he first treated Claimant at the age of six (6) for "severe ADHD, uncontrollable motor activity, and unruly behavior." Tr. 17. The ALJ also acknowledged that Dr. Schapiro had stated that "[C]laimant 'has had difficulties holding jobs' due to his attentional problems, his impulsivity, and his inability to follow directions" and that "[C]laimant was unable to hold a job on a full

17

time basis." Tr. 17. Indeed, "Dr. Schapiro had expressed the opinion that the [C]laimant's ability to understand and remember and carry out one or two step instructions, and the ability to accept instructions and respond appropriately to criticism from supervisors was markedly limited." Tr. 17 (emphasis added). The ALJ, however, then discounted the opinion of Dr. Schapiro, proffering two grounds for doing so: his inability to decipher the treating psychiatrist's notes; and his understanding of the hearing testimony. According to the ALJ:

> [T]he Administrative Law Judge will give little weight to the opinion of Dr. Schapiro. First, his progress notes are handwritten and nearly illegible and therefore offer no support for his opinion. More importantly, his opinion is inconsistent with the testimony of the [C]laimant and his mother, both of whom testified that the [C]laimant was able to work.

Tr. 17. These proffered reasons, however, are flawed.

### b.  The Inability to Decipher the Treating Source's Notes

The first reason proffered by the ALJ for discounting the treating source's opinion that Claimant cannot work a full-time job is that the source's progress notes are illegible and, therefore, offer no support for his opinion. The Code of Federal Regulations, however, speaks clearly to the ALJ's obligation to recontact a claimant's treating source for clarification where the evidence received from that source is inadequate:

> Recontacting medical sources. When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. To obtain the information, we will take the following actions.
>
> We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek

18

> additional evidence or clarification from your medical source
> when the report from your medical source contains a conflict
> or ambiguity that must be resolved, the report does not contain
> all the necessary information, or does not appear to be based
> on medically acceptable clinical and laboratory diagnostic
> techniques. We may do this by requesting copies of your
> medical source's records, a new report, or a more detailed
> report from your medical source, including your treating
> source, or by telephoning your medical source. In every
> instance where medical evidence is obtained over the
> telephone, the telephone report will be sent to the source for
> review, signature and return.

20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1) (emphasis added).  The Commissioner's own

Social Security Rulings also speak to the ALJ's obligation to re-contact a treating source

for clarification where the basis for the opinion cannot be ascertained:

> Because treating source evidence (including opinion evidence)
> is important, if the evidence does not support a treating
> source's opinion on any issue reserved to the Commissioner
> and the adjudicator cannot ascertain the basis of the opinion
> from the case record, the adjudicator must make "every
> reasonable effort" to recontact the source for clarification of the
> reasons for the opinion.

SSR 96-5p (emphasis added).

Concerned about the ALJ's failure to make any effort – let alone "every reasonable

effort" – to recontact the treating source for a clarification of his progress notes, the

undersigned asked the Commissioner to file a supplemental response, addressing the

propriety of a remand.  The Commissioner responded that a remand was not warranted

because "[i]f the ALJ could not decipher the notes the first time he read them, it is unlikely

that he will be able to read them at a later time."  Supplemental Brief at 6 (DE 17).  From

this statement, it might appear that the Commissioner has not considered that a remand

would allow the ALJ to recontact the treating source for a clarification, not merely a

19

duplication, of his handwritten notes, thereby providing him with a valuable insight into the limiting effects of the Claimant's impairments. The Commissioner, however, also appears to dismiss the value of recontacting the treating source: "It is also unlikely that Dr. Schapiro will be able to provide more legible copies of his treatment notes." Id. at 6. The Commissioner, however, misses the point: the purpose of recontacting Dr. Schapiro would not be to obtain another illegible photocopy of the notes, but to obtain a clarification, be it in a new or a more detailed report, rendered either orally or in a more legible written format (printed or typewritten). See 20 C.F.R. § 416.912(e)(1) ("We may [seek clarification] by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source.") (emphasis added). The Commissioner has not proffered any reasoned justification for not even attempting to recontact the treating source or for the notion that it would be futile to do so. Given the obvious importance of these notes – the ALJ discounted the opinion of a 20-year treating psychiatrist (in part) because he found the notes illegible – the ALJ should have complied with his own Regulations and Rulings by attempting to recontact the source for clarification. And by failing to recontact the treating source, the ALJ failed in his duty to fully develop the record.

In assessing the propriety of a remand, the Eleventh Circuit has instructed that courts must be "guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice"; it added that "[t]he lack of medical . . . documentation supporting an applicant's allegations of disability is undoubtedly prejudicial to a claim for benefits." Brown v. Shalala, 44 F.3d 931, 935-36 (11th Cir. 1995). Although the Brown Court cautioned that it was not "suggest[ing] that a remand is warranted any time a

claimant alleges that the ALJ has neglected to complete the record," the court nonetheless made clear that the "likelihood of unfair prejudice to a claimant may arise . . . where as here, the evidentiary gap involves recent medical treatment, which the claimant contends supports her allegations of disability, . . ." Id. at 936 n. 9. A remand for clarification is warranted here as Claimant has suffered clear prejudice. By not recontacting Claimant's 20-year treating source, the ALJ has left intact a significant evidentiary gap that involves recent medical treatment – handwritten notes from May 2006 to March 2008 – and that allegedly supports the claims of disability.

Finally, the undersigned notes that the ALJ's failure to recontact the treating source is further exacerbated by his disregard of the treating source's legible materials. In his questionnaire responses, Dr. Schapiro clearly set forth the clinical findings supporting his diagnoses and opinions: poor memory, mood disturbances, emotional lability, substance dependence, psychomotor agitation, difficulty concentrating, and social withdrawal. Tr. 404. Yet, the ALJ failed to acknowledge, let alone address, these findings. The ALJ instead focused on the illegibility of the handwritten treatment notes, simply assuming for purposes of his decision that they do not support the source's functionality assessments.

c.     ALJ's Understanding of the Hearing Testimony

The second reason proffered by the ALJ for discounting the treating source's opinion that Claimant cannot work a full-time job is that it "is inconsistent with the testimony of the [C]laimant and his mother, both of whom testified that the [C]laimant was able to work [fixing bicycles]." Tr. 17. Claimant's counsel counters that "[n]either [Claimant] nor his mother testified that he retained the ability to 'work' as that term is defined in the disability context." Plaintiff's Motion at 12 (DE 12). The undersigned agrees with

21

Claimant's counsel and concludes that the ALJ's characterization of that testimony is not an objectively reasonable one.

As he began questioning Claimant and his mother, the ALJ asked each whether Claimant would be able to fix bicycles if the ALJ were to call a friend who owns a bicycle shop and get him a job in that shop; they both initially responded affirmatively. Tr. 33, 39. Significantly, however, those initial responses were clarified. While Claimant acknowledged that he has worked on his own bicycle at his house, he also informed the ALJ that he had never worked on any other person's bicycle; he added that he can "just do what [he] can do on [his] bike." Tr. 31, 33, 35. Moreover, Claimant's entire testimony must be considered read the backdrop of his mental impairments; he remains a "severely behavioral/emotionally impaired young adult[]," who spent 6 of his childhood years as an inpatient and who as an adult has a GAF in the extremely low 31 to 40 range. Tr. 331, 402-403. Claimant's testimony, therefore, cannot reasonably be taken as an "admission" that he is somehow able to do something that, in fact, he has never done before.

Moreover, Claimant's mother testified to the many difficulties that Claimant has previously had sustaining full-time employment, and she made clear to the ALJ that she did not know if her son could function in a work setting fixing bicycles. She explained that even though he "enjoys taking things apart," he still "has a hard time following directions," suffers from an "extremely bad" memory, and suffers from impulsive bouts of anger. Tr. 40. She described for the ALJ his severe behavioral problems, including his temper tantrums, his frustration from not being able to read, his poor memory, his impulsiveness, and his inability to concentrate on one task without constantly going from one activity to another. Tr. 39-43. For those reasons, Claimant has never been able to sustain a job

22

longer than 18 months. And even that job, which was with a fireproofing company, was attained for him by his mother and required her ongoing efforts just to make it last that long. According to Claimant's mother: "[I]t was a constant battle" for him to be there; she had to "explain his medical problems" to his superior, who ultimately told her "not to bring him back" because "he loses his patience," gets angry, and walks off the job. Tr. 41. Claimant also had a short-lived landscaping job; but after only a week they "called [his mother] and told [her] that they did not want him coming back" because of his "[a]nger" and his being "very forgetful." Tr. 41. Claimant's mother also explained that "if they tell him to go get something[,] [b]y the time he gets there, he doesn't remember what they told him to get. And then he'll go back and ask, and then they get annoyed because he's wasting time." Tr. 41.

Claimant's mother advised the ALJ that those same memory and temperament problems that have caused problems in the workplace, have also caused problems at home. Claimant's mother explained that she has to set out his medication daily in order for him to take it. Yet, if he were to get a drink of water first, she will find that the medication is still lying there; that one simple distraction will cause Claimant to forget his medication. Tr. 41. Similarly, Claimant's mother must not only remind him, but really get "on him," to brush his teeth, to comb his hair, and to bathe. Tr. 43. Significantly, she will not allow him to use an oven because "he forgets to turn it off." Tr. 43. She also described his angry outbursts at home, stating that they occur "[c]onstantly," where he will be "yelling and screaming and throwing things" and that she "can't figure [] out" what sets him off, although his inability to read frustrates him and causes him to "break things." Tr. 40. Accordingly, it was not reasonable for the ALJ to characterize the mother's testimony as

consistent with the ability to "work" – and, moreover, inconsistent with Dr. Schapiro's assessments of marked mental functional limitations. The ALJ's characterization fails to account for the vast majority of her testimony concerning Claimant's limitations. Simply stated, the ALJ's characterization is not a reasonable reading of that testimony and does not amount to "good cause" for rejecting the disability opinion of Claimant's 20-year treating psychiatrist.

## 2. ALJ's Assessment of the Consultative and Non-Examining Sources

### a. Consultative Source

Dr. Shakes-Malone is a consultative psychologist whose opinion was procured by the Commissioner. Tr. 335-38. The ALJ did acknowledge her opinion that Claimant would require special "social skills training" due to his borderline intellectual functioning and his impulse control disorder; Dr. Shakes-Malone thought such training "might" allow him to function in a work environment.[8] Tr. 337. But after acknowledging Dr. Shakes-Malone's opinion, the ALJ never returned to it; he never accepted it, never rejected it, and never incorporated it into the RFC finding. The Commissioner defends the ALJ's failure to accord specific weight to Dr. Shakes-Malone's opinion by claiming that she merely "recited the results of testing and an interview" and "did not provide any opinion on [Claimant's] ability to function in a work setting." Defendant's Motion at 9 (DE 13). The undersigned does not agree. In her "Prognosis and Recommendation," Dr. Shakes-Malone specifically opined

---

[8] In her report, Dr. Shakes-Malone noted that, as a student, Claimant attended special education classes for severely emotionally disturbed children and that, as an adult, he has had several psychiatric hospitalizations due to aggressive, out-of-control behavior. Tr. 335-36. She also noted that Claimant had disclosed that he was unable to keep his previous jobs owing to his difficulty in social relationships. Tr. 335.

that Claimant "may benefit from social skills training that might allow him to function in a work environment with others," the clear implication being that he presently would have difficulty functioning in a work environment. Tr. 337, The ALJ, therefore, ignored the opinion of a consultative psychologist, which opinion is not consistent with the ALJ's finding that Claimant has the present ability to perform work, even at the unskilled level. Tr. 337. And by simply ignoring Dr. Shakes-Malone's opinion without an explanation, the ALJ erred. See, e.g., Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987) (per curiam) (ALJ's failure to state with particularity the weight accorded different medical opinions is reversible error).

### b. Non-Examining Sources

Drs. McCallister and Levasseur are non-examining psychologists employed by a state agency to review Claimant's records. The ALJ stated that he gave "great weight" to the opinion of these non-examining psychologists "because they presented relevant evidence to support their opinions and provided a good explanation for their opinions." Tr. 17. According to the ALJ, the state agency psychologists found that Claimant could understand and follow simple instructions, get along with others, make basic work decisions, and adapt adequately to a work environment. Tr. 17. The ALJ also noted that the two reviewers had found that Claimant has some reduction in concentration that would limit his ability to complete complex tasks and that he has some reduction in social interaction that would limit him to work environments of low social demands. Tr. 17.

Yet, the ALJ failed to note that these same two reviewing psychologists, to whose opinions he accorded "great weight," had both found that Claimant was moderately limited in the following abilities: to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without rest periods

of unreasonable length and frequency; to maintain socially appropriate behavior; and to adhere to basic standards of neatness and cleanliness. Tr. 339-40, 383-84. In addition, Dr. Levasseur found that Claimant was moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors. Tr. 384. The ALJ failed to credit any of these limitations in his ultimate RFC finding, despite stating that the two reviewers had "presented relevant evidence to support their opinions and provided a good explanation for the opinions." Tr. 17. The Commissioner sought to explain the ALJ's failure to account for the balance of the reviewers' findings by drawing a distinction in the quantum of weight that the ALJ had accorded: "While the ALJ accorded great weight to the opinions of the Stage Agency psychologists, he did not and was not required to accord them controlling weight." Defendant's Motion at 10 (DE 13). The Commissioner's response is unavailing. Whether the ALJ chose to accord these opinions "controlling weight" or "great weight," the Commissioner's response does not explain the ALJ's failure to address the reviewers' enumerated limitations. The ALJ's failure is all the more perplexing given his belief that the reviewers had provided good explanations for their opinions.

## VI.   RECOMMENDATION

Because the ALJ failed to recontact Claimant's long-time treating psychiatrist and because the ALJ's reading of the hearing testimony was not reasonable, the ALJ failed to articulate "good cause" for discounting the treating source's disability opinion; a remand, therefore, is warranted. In addition, however, the ALJ failed to address the consultative psychologist's opinion that social skills training would be required so that Claimant "might" be able to function in a work environment. And, despite according "great weight" to the

opinion of the non-examining psychologists at the state agency, the ALJ failed to address those reviewer limitations that are not supportive of his RFC finding. Accordingly, the undesigned respectfully RECOMMENDS that Plaintiff's Motion for Summary Judgment (DE 12) be GRANTED, that Defendant's Motion for Summary Judgment (DE 13) be DENIED, and that the Commissioner's decision be REVERSED and REMANDED to the Commissioner with instructions to recontact the Dr. Schapiro, to reconsider the hearing testimony, to address Dr. Shakes-Malone's opinion, and to address the reviewing psychologists' limitations.

The parties will have ten (10) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable James I. Cohn, United States District Judge. Failure to file objections timely shall bar the parties from a de novo determination by the district court of an issue covered in the report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the district court except upon grounds of plain error or manifest injustice. See 28. U.S.C. § 636(b)(1); Nettles v. Wainwright, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc).

DONE and SUBMITTED at Fort Lauderdale, Florida this ___ day of November 2009.

BARRY S. SELTZER
United States Magistrate Judge

27

Copies furnished to:

Honorable James I. Cohn
United States District Judge

Jennifer L. Faerber, Esq.
One East Broward Blvd., #1111
Fort Lauderdale, Florida  33301
Counsel for Plaintiff Michael Krapf

James A.  Weinkle, Esq.
Assistant United States Attorney
99 NE 4th Street, Suite 300
Miami, Florida  33132